# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# NEWNAN DIVISION

UNITED STATES OF AMERICA    :

:     CRIMINAL CASE NO.

v.                :    3:19-cr-00010-TCB-RGV

:

HECTOR MENDEZ-BERNAL, *et al.*  :

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendants Hector Mendez-Bernal ("Hector") and Jose Antonio Mendez-Bernal ("Jose"), jointly referred to as "defendants," are charged in a six-count indictment with conspiracy to import cocaine and heroin, in violation of 21 U.S.C. § 963, importation of cocaine and heroin, in violation of 21 U.S.C. §§ 952, 960(b)(1)(A), and 960(b)(2)(B) and 18 U.S.C. § 2, conspiracy to distribute cocaine and heroin, in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine and heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and 18 U.S.C. § 2.  [Doc. 1].[1]  Hector has filed a motion to suppress evidence, [Doc. 29], a motion to suppress statements, [Doc. 30], and a motion to suppress the warrantless

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

search of his cell phone, [Doc. 31]. Jose also has filed a motion to suppress evidence, [Doc. 32], a motion to suppress statements, [Doc. 33], and a motion for severance and exclusion of out-of-court statements,[2] [Doc. 34]. An evidentiary hearing was held on the motions to suppress on February 5, 2020. See [Doc. 43].[3] After the evidentiary hearing, the parties filed post-hearing briefs. [Docs. 52, 56, & 59].[4] For the reasons that follow, it is **RECOMMENDED** that the motion for severance, [Doc. 34], be **GRANTED**, that Hector's motion to suppress statements, [Doc. 30], be **GRANTED IN PART** and **DENIED IN PART**, and that the remaining motions to suppress evidence and statements, [Docs. 29, 31, 32, & 33], be **DENIED**.

---

[2] The government has informed the Court that it does not oppose the motion to sever. [Doc. 34].

[3] See [Doc. 50] for the transcript of the evidentiary hearing, which will be referred to hereinafter as "(Tr. at __)." The government submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. __)."

[4] At the evidentiary hearing, the government introduced an English language summary of statements that were recorded while defendants were in the back seat of a patrol car following a traffic stop. See (Tr. at 138-39; Gov. Ex. 9). Jose's counsel requested that the record be supplemented with the video recording of these statements. (Tr. at 138-39). The Court therefore held the record open so that the video recording could be submitted. (Tr. at 139). On July 17, 2020, the government and Jose filed a joint motion for an extension of time to supplement the record, [Doc. 65], and they have now submitted the video recording, which the Court has admitted as Gov. Ex. 9-A, [id. at 2]. Accordingly, the joint motion for an extension of time to supplement the record, [Doc. 65], is hereby **GRANTED**.

# I.  STATEMENT OF FACTS

## A.   Initiation of the Investigation

In October 2018, agents of the Drug Enforcement Agency ("DEA") in Chicago ("DEA Chicago") seized a quantity of heroin hidden in a large, heavy metal cylinder.  (Tr. at 7, 21; Gov. Ex. 1 at 2).  Prior to the seizure, DEA Chicago had obtained a geo-location warrant for a particular cell phone ("the target cell phone"), and agents had tracked the target cell phone to the location where the cylinder filled with heroin was seized.  (Tr. at 7-8).  Surveillance and subsequent investigation revealed that the cylinder was delivered by two Hispanic men who possibly were brothers driving a small vehicle, possibly a gray Chevy sedan, with a Mexican license plate.  (Tr. at 9, 26, 34, 40-41, 90; Gov. Ex. 5 at 1-2).  After the cylinder was delivered, DEA Chicago tracked the target cell phone as it traveled south to the US-Mexico border.  (Tr. at 8).  Once the target cell phone crossed the border, agents were no longer able to track it.  (Tr. at 7-9).

 On January 25, 2019, DEA Chicago agents informed their counterparts in Atlanta that the target cell phone was back in the United States and traveling in the direction of Atlanta.  (Tr. at 7).  As a result, DEA Atlanta agents coordinated with the Georgia State Patrol ("GSP") to attempt to locate the vehicle in which the target cell phone was traveling on Interstate 85, utilizing the description of the

vehicle and the two men who had delivered the cylinder in Chicago.  (Tr. at 9-10, 45).  GSP troopers and DEA agents also were provided a photograph of the cylinder seized in Chicago.  (Tr. at 10, 45).  Their plan was to develop probable cause for a traffic stop and to obtain authority to search the vehicle to look for a cylinder similar to the one found in Chicago.  (Tr. at 11, 38).

**B.**   **Identifying Defendants' Rental Vehicle**

Because service for the target cell phone was provided by a Mexican cell phone carrier, the geo-location data provided to agents in Atlanta was delayed by about 15 minutes, which increased the difficulty of identifying the suspected vehicle connected with the target cell phone.  (Tr. at 11-12).  Eventually, GSP Trooper Anthony Munoz ("Trooper Munoz"), a law enforcement officer with training in drug trafficking and criminal interdiction, observed a vehicle in which the target cell phone was believed to be located traveling north on Interstate 85 in Coweta County, Georgia.  (Tr. at 39, 44, 48-50, 69).  Trooper Munoz was able to see the driver of the vehicle from his vantage point parked on the side of the interstate, and the driver appeared to be abnormally tense.  (Tr. at 49).  The vehicle, which was a small sedan with a Mexican license plate, was occupied by two Hispanic

men.  (Tr. at 49-50).[5]  In Trooper Munoz's experience, it was "maybe once [] every couple of months or six months" that he would see a vehicle with a Mexican license plate on the highway.  (Tr. at 90).

Once Trooper Munoz located the vehicle, he followed it for a few miles.  (Tr. at 51-52, 70-71).  When the vehicle reached a construction zone with a posted 60 miles per hour speed limit, Trooper Munoz paced the vehicle as traveling at between 70 to 75 miles per hour.  (Tr. at 51, 73).  As a result, Trooper Munoz decided to stop the vehicle for speeding, and after he activated the lights on his patrol car, the vehicle pulled to the right shoulder, but drove for an inordinate amount of time in the emergency lane according to Trooper Munoz before eventually coming to a stop, which he found to be suspicious.  (Tr. at 52).  Trooper Munoz also noticed that the trunk appeared to be lower than the rest of the vehicle, which further aroused his suspicion.  (Tr. at 52-53).

## C.    The Traffic Stop

After pulling the vehicle over at approximately 5:40 p.m. on January 25, 2019, Trooper Munoz, who does not speak Spanish, determined that the occupants of

-----

[5] The vehicle was a white Nissan Versa as opposed to a gray Chevy sedan, but Trooper Munoz testified that "everything else matched."  (Tr. at 34-35, 45, 48, 50); see also (Tr. at 103-04).

the vehicle could not speak English.  (Tr. at 53-54, 70, 82).  As a result, he had to utilize a translation application on his cell phone in order to speak with the driver of the vehicle, Jose.  (Tr. at 48, 54, 56, 74-75, 84).  Due to the cold weather, traffic noise, and the danger of standing on the side of the interstate, Trooper Munoz motioned for Jose to sit in his GSP patrol car with him so they could converse using the translation application.  (Tr. at 53-55, 92-93).  Trooper Munoz sat in the driver's seat of his patrol car, and Jose sat next to him in the front passenger seat.  See generally (Gov. Ex. 4).  The passenger in the Nissan, later identified as Jose's brother, Hector, remained seated in the vehicle where it had been stopped.  (Id.).

Once inside the patrol car, Trooper Munoz reviewed the car rental paperwork that Jose handed him, and it indicated that Jose had rented the vehicle in Mexico.  (Tr. at 59; Gov. Ex. 3).  Because the rental car had a Mexican registration with paperwork in Spanish, the traffic stop was extended significantly as Trooper Munoz had difficulty in verifying the information through law enforcement databases.  (Tr. at 56).  At the beginning of the stop, Trooper Munoz asked Jose the same basic questions that he would ask any other driver pulled over for speeding.  (Tr. at 57).  As part of Trooper Munoz's routine questioning, he asked Jose about his travel plans.  Jose told Trooper Munoz that he had driven from Mexico to Houston and stayed with his brother Hector for a few hours and that they were

6

on their way to see their cousin in Atlanta for two days before returning to Mexico. (Tr. at 57-58; Gov. Ex. 10 at 5-10).  Jose was unable to provide Trooper Munoz with his cousin's address in the Atlanta area.   (Tr. at 57, 105; Gov. Ex. 10 at 5-10).

Jose's answers to the questions posed about his travel and destination further heightened Trooper Munoz's suspicion that the brothers might be involved in narcotics trafficking.  (Tr. at 57-58).  As a result, Trooper Munoz asked Jose if he was carrying anything illegal in the car.  Jose said, "No," and he offered to allow Trooper Munoz to search the vehicle.  (Gov. Ex. 10 at 10-11).  Trooper Munoz ultimately decided to give Jose a warning for speeding, but he had difficulty reading the information on the driver's license and vehicle registration because it was in a foreign language.  (Gov. Ex. 10 at 11-14, 20, 23).  Once he completed processing the documentation and preparing the warning for speeding, Trooper Munoz also printed a Spanish language consent to search form and presented it to Jose for his review.  (Tr. at 59).  Jose declined to sign the form, but told Trooper Munoz that he still could search the rental vehicle.  (Tr. at 59-60, 85, 94-95; Gov. Ex. 10 at 23-25).[6]

---

[6] Jose was not handcuffed during any of the conversation in the patrol car, nor was he locked in the vehicle.  Trooper Munoz was not verbally abusive to Jose and did not use any physical force on him.  (Tr. at 63-64; Gov. Ex. 4 at 3:31–36:10).

D.    **Search of the Vehicle and Conversation with Defendants**

Jose and Trooper Munoz then exited the patrol car, (Tr. at 61; Gov. Ex. 10 at

25), and Trooper Munoz began the search of the vehicle after asking Hector to step

out of the vehicle, (Tr. at 61).  While the vehicle was searched, Jose and Hector

stood or sat, unrestrained, outside of the rental vehicle along the shoulder of the

interstate.[7]  (Gov. Ex. 4 at 37:00-1:18:32).  Eventually, Trooper Munoz found in the

trunk a large, metal cylinder similar to the metal cylinder seized by DEA Chicago

as depicted in the photograph he had been provided prior to the traffic stop.  (Tr.

at 61-62).  In the meantime, other law enforcement officers had arrived at the scene,

and a GSP K-9 handler subsequently deployed his narcotics detection dog during

the search of the vehicle.  (Tr. at 78, 150-52).  The dog alerted to the scent of

narcotics on the metal cylinder.  (Tr. at 78, 88-89, 150-51, 153; Gov. Ex. 4 at 52:30–

53:24).

After the search, Trooper Munoz, with translation provided by DEA Task

Force Officer ("TFO") Nermin Cultarevic ("TFO Cultarevic"), informed Jose and

---

[7] As he began the search of the vehicle, Trooper Munoz retrieved a jacket from the vehicle, searched it, and then gave it to Jose to wear as he waited on the shoulder of the interstate, (Gov. Ex. 4 at 37:17-37:41), and another officer subsequently set up a folding chair for Hector to sit in because he was having difficulty standing, (Tr. at 61, 104; Gov. Ex. 4 at 42:10).

Hector that they were not under arrest but were being detained. (Tr. at 62-63; Gov. Ex. 4 at 54:20). Up to that point, law enforcement officers had used no physical force on either of the defendants, had not threatened them, had not displayed their weapons, and neither one had been restrained at the roadside. (Gov. Ex. 4 at 3:20-54:20). Even after law enforcement officers told Jose and Hector that they were being detained, they did not physically restrain them in any way as the brothers remained on the shoulder of the interstate until they were placed in the back seat of a patrol car to travel to another location where the cylinder could be cut open and searched.[8] (Gov. Ex. 4 at 54:20-1:18:32).[9]

## E.  <u>Search of the Metal Cylinder</u>

After finding the large, metal cylinder, law enforcement moved the search to a nearby fire station for safety reasons and because they needed tools to be able to cut into the cylinder. (Tr. at 64, 87). Although Hector, who claimed ownership of the cylinder, gave them permission to cut it open, law enforcement obtained a

---

[8] During and after the search at the roadside, law enforcement officers spoke with both Hector and Jose, asking them about the metal cylinder, their intended plans in Georgia, their cousin's name, and other related details. (Gov. Ex. 5 at 2; Gov. Ex. 4 at 37:00 – 54:20).

[9] The stop and search will be discussed in greater detail when addressing the motions to suppress.

search warrant for the cylinder.  (Tr. at 13-14, 79, 106, 108-09, 115; Gov. Ex. 4 at 47:32; Gov. Exs. 5 & 6).  After cutting open the cylinder, law enforcement found quantities of narcotics wrapped in cellophane inside.  (Tr. at 14, 108).

At the fire station, Jose and Hector remained seated in the back of a GSP patrol car without handcuffs for a few hours while a search warrant was obtained and the cylinder was being cut open.  (Tr. at 30, 79, 87, 124, 136-37; Gov. Ex. 9-A).  A recording device in the patrol car where they were seated was on, (Tr. at 87-88; Gov. Ex. 9-A), and at some point after the narcotics had been discovered, Trooper Munoz approached the patrol car, opened the door, and said, "That's no bueno, no bueno.  Yeah, no bueno; that's not good."  (Tr. at 64, 66, 88; Gov. 9 at 2; Gov. 9-A at 1:02:30-1:02:45).  Hector said, "What?  I don't know," in Spanish, and Trooper Munoz then said, "I'll show you," (Gov. 9 at 2; Gov. 9-A at 1:02:30-1:02:45), and showed them a photograph of the drugs found in the cylinder, and then said, "Senor, come on now; all right, un momento," (Tr. at 66, 88; Gov. 9 at 2; Gov. 9-A at 1:02:30-1:02:45), and he closed the door, (Tr. at 65-66, 88, 95-96).  Trooper Munoz testified that he did not ask them any questions, and he made the "no bueno" comment to inform the defendants that law enforcement had found the drugs, and he did not recall how they responded to his statement.  (Tr. at 66, 95-96).  When Trooper Munoz closed the car door, Hector said, "They opened it."  (Gov. Ex. 9 at

2).  Almost immediately thereafter, TFO Cultarevic opened the patrol car door and asked Hector for his cell phone passcode, which Hector provided.[10]  (Id.; Tr. at 110, 122-23, 126-27).  Thereafter, Hector, while alone in the vehicle with Jose, made a few incriminating statements that were captured by the patrol car's recording device.  (Gov. Ex. 9 at 2).  Following the discovery of the narcotics in the cylinder, the defendants were arrested.  (Tr. at 14).  At no point in time on January 25, 2019, did law enforcement officers read either defendant their Miranda[11] rights during the traffic stop or at the fire station.  (Tr. at 76, 111, 116, 125).

## F.    Hector's Post-Miranda Interview at the Jail

On January 26, 2019, the day after the narcotics were found, Hector requested to interview with law enforcement.  (Tr. at 28).  He was interviewed by DEA Special Agent ("SA") Ray DeVogt ("SA DeVogt") and TFO Jose Marrero ("TFO Marrero") at the Coweta County jail.  (Tr. at 14-15, 130; Gov. Exs. 8 & 11).  TFO Marrero acted as translator for SA DeVogt, who does not speak Spanish.  (Tr.

_____

[10] TFO Cultarevic did not raise his voice or utilize his weapon or any force when he asked Hector to give him the passcode, and Hector remained unrestrained in the back seat of the patrol car.  (Tr. at 110-11, 122-24).  No one searched Hector's phone while at the fire station.  (Tr. at 111, 125-27).

[11] See Miranda v. Arizona, 384 U.S. 436 (1966).

11

at 15, 135).  Prior to the interview, TFO Marrero read Hector his <u>Miranda</u> rights in

Spanish.  (Tr. at 28-29, 131-34; Gov. Ex. 7 at 1; Gov. Ex. 8; Gov. Ex. 11 at 2-4).  They

had no substantive conversation with Hector prior to the <u>Miranda</u> warning.  (Tr.

at 15-16, 131; Gov. Ex. 8; Gov. Ex. 11 at 2-4).  During the interview, Hector granted

law enforcement consent to search his cell phone.  (Tr. at 131-32; Gov. Ex. 7 at 2;

Gov. Ex. 8; Gov. Ex. 11 at 50-56). [12]   The recording of Hector's interview

demonstrates that law enforcement did a cursory search of Hector's cell phone and

asked him questions about certain information in his cell phone.  <u>See generally</u>

(Gov. Exs. 8 & 11); <u>see also</u> (Tr. at 32-33).  A few days later, law enforcement

obtained search warrants for both Jose and Hector's cell phones which were seized

from the rental car after the drugs were found.  (Gov. Exs. 1 & 2).

## II.  DISCUSSION

A.    <u>Motions to Suppress Evidence, [Docs. 29 & 32]</u>

Both defendants move to suppress evidence seized following the stop of the

vehicle in which they were traveling on January 25, 2019, contesting the legality of

_____

[12] TFO Marrero testified that he did not make physical contact with Hector, nor did he raise his voice to get Hector to waive his <u>Miranda</u> rights or to obtain his consent to search his cell phone, and that neither he nor SA DeVogt drew their weapons or "provide[d] any other sort of undue influence in order to get [him] to waive his Miranda rights and provide consent to search[.]"  (Tr. at 134-35).

the traffic stop and subsequent search of the vehicle.  Specifically, Jose challenges the credibility of Trooper Munoz's testimony that the car was speeding as a justification for the stop, and even if the stop was valid, he argues that it was unlawfully extended, his consent to search the vehicle was not valid, and "the seizure and search of the cylinder and his phone are fruits of the unlawful questioning and Fourth Amendment violations."  [Doc. 56 at 1, 7, 12-13].  Hector similarly argues that the traffic stop was pretextual and unlawfully "prolonged such that it morphed into a full-fledged drug investigation without independently supported reasonable suspicion," and he contends that his seizure "was unreasonable and all that followed is fruit of the poison tree and should be suppressed."  [Doc. 52 at 5].  The government responds that the motions to suppress should be denied because "there was reasonable suspicion for the stop, the stop was performed pursuant to a traffic violation, and voluntary consent was obtained for the search."  [Doc. 59 at 26].

### 1.   *Probable Cause to Initiate the Traffic Stop*

"The Fourth Amendment protects individuals from unreasonable search and seizure."  United States v. Rowls, 402 F. App'x 467, 468 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted).  The "[t]emporary detention of individuals during the stop of an automobile by the police, even if

only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996) (citations omitted); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001); United States v. Edenilson-Reyes, Criminal Action File No. 1:09–CR–00361–RWS–AJB, 2010 WL 5620439, at *9 (N.D. Ga. Oct. 26, 2010), adopted by 2011 WL 195679, at *1 (N.D. Ga. Jan. 20, 2011).

A traffic stop is reasonable if the officer had probable cause to believe that a traffic violation has occurred, or if the traffic stop is justified by reasonable suspicion in compliance with Terry v. Ohio, 392 U.S. 1 (1968). Edenilson-Reyes, 2010 WL 5620439, at *9 (citing United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009); Purcell, 236 F.3d at 1277); see also United States v. Monzon-Gomez, 244 F. App'x 954, 959 (11th Cir. 2007) (per curiam) (unpublished); United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999); United States v. Sierra, Cr. No. 2:10cr183–MEF, 2011 WL 1675217, at *2 (M.D. Ala. Apr. 19, 2011), adopted by 2011 WL 1675180, at *1 (M.D. Ala. May 4, 2011), aff'd by 501 F. App'x 900 (11th Cir. 2012) (per curiam) (unpublished). Thus, "[a] traffic stop . . . is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or

14

justified by reasonable suspicion. . . ."[13] <u>Edenilson-Reyes</u>, 2010 WL 5620439, at *9 (alterations in original) (citations and internal marks omitted); <u>see also</u> <u>United States v. Boyd</u>, 388 F. App'x 943, 947 (11th Cir. 2010) (per curiam) (unpublished); <u>United States v. Woods</u>, 385 F. App'x 914, 915 (11th Cir. 2010) (per curiam) (unpublished). The government bears the burden of presenting facts to establish that the traffic stop is supported by reasonable suspicion or probable cause. <u>See</u> <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 749-50 (1984); <u>see also</u> <u>United States v. Kelly</u>, No. 1:13–cr–108–WSD–JSA, 2014 WL 1153375, at *8 (N.D. Ga. Mar. 21, 2014), adopted at *4 (citations omitted).

An officer's subjective intentions and motives are irrelevant where the officer has probable cause for the stop. <u>See</u> <u>United States v. Mwangi</u>, Criminal File No. 1:09-CR-107-TWT, 2010 WL 520793, at *3 n.9 (N.D. Ga. Feb. 5, 2010), adopted at *1 (citations omitted); <u>see also</u> <u>United States v. Arango</u>, 396 F. App'x 631, 632-33 (11th Cir. 2010) (per curiam) (unpublished) (citation and internal marks omitted)

---

[13] Probable cause must be supported by more than a mere suspicion, but does not require the same "'standard of conclusiveness and probability as the facts necessary to support a conviction.'" <u>United States v. Dunn</u>, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting <u>Wood v. Kesler</u>, 323 F.3d 872, 878 (11th Cir. 2003)). Reasonable suspicion is a less demanding standard than probable cause and requires only a fair probability that illegal activity has occurred. <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989).

("Where objectively reasonable conditions permit a stop, the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment."); Miller v. Harget, 458 F.3d 1251, 1260 (11th Cir. 2006) (citations omitted) ("It is well-settled that an officer's subjective motivations do not affect whether probable cause existed"); United States v. Jimenez, No. 2:06-cr-74-FtM-29DNF, 2006 WL 2927477, at *2 (M.D. Fla. Oct. 11, 2006) (holding that "an officer's belief that he has probable cause or does not have probable cause is simply not a pertinent factor" in determining whether an arrest is lawful). That is, "if the driver of a car has broken a traffic law, no matter how relatively minor, a motion to suppress evidence cannot be based on the argument that the stop was pretextual." United States v. Wright, No. CR210-022, 2010 WL 4967468, at *1 (S.D. Ga. Nov. 5, 2010), adopted by 2010 WL 4967838, at *1 (S.D. Ga. Dec. 1, 2010) (citation omitted).

In addition, "[t]he propriety of the traffic stop [] does not depend on whether the defendant is actually guilty of committing a traffic offense." United States v. Sicairos-Sicairos, Criminal Action File No. 4:10–CR–054–HLM, 2011 WL 2710031, at *5 (N.D. Ga. July 11, 2011) (citation omitted). "Instead, the relevant question is whether it was reasonable for the officer to believe that a traffic offense had been committed." Id. (citation omitted).

16

Jose acknowledges that "a lawful stop for speeding would have been permissible," but he argues that "the officers had already decided to stop the car regardless, and their testimony was in conflict about whether the car was initially driving slowly or speeding," so he contends that "[t]he testimony was not credible on that point and should be disregarded as a valid justification for the stop." [Doc. 56 at 7]. Jose has not identified any actual conflict in the testimony,[14] see [id.], and Trooper Munoz credibly and unequivocally testified that he observed the vehicle Jose was driving speeding in a construction zone on Interstate 85, (Tr. at 51, 73). Specifically, Trooper Munoz testified that after he located the vehicle as it was traveling north on Interstate 85, he followed it for a few miles before it reached a construction zone where the speed limit was 60 miles per hour, and he paced the

---

[14] In the facts section of his post-hearing brief, Jose asserts that Trooper Munoz testified that the defendants' vehicle was driving slowly when he saw it, but then claimed they were speeding in the construction zone, whereas TFO Cultarevic testified that the vehicle was moving at a high rate of speed. [Doc. 56 at 3]. However, Jose has not identified any inconsistency in Trooper Munoz's testimony that the vehicle was speeding in the construction zone. Trooper Munoz testified that although the vehicle was traveling "slower than normal speed" as it approached him, (Tr. at 49), which he indicated was less than "75, 80 miles an hour passing [him]" that some people travel when he is sitting in a marked patrol car along the interstate, (id.), he testified that after he entered traffic and proceeded northbound on Interstate 85, they were "a little bit out of [his] sight," (Tr. at 51), and once he got through traffic, "they had increased speed a little bit, 70, 75 miles an hour" as they approached the construction zone, (id.).

vehicle in the construction zone and determined that it was traveling between 70 to 75 miles per hour.  (Id.).  Consequently, he initiated a traffic stop of the vehicle for speeding and subsequently issued Jose a warning for speeding.  (Tr. at 51-52, 73; Gov. Ex. 10 at 11).

Having considered the evidence and testimony presented at the evidentiary hearing, the "Court finds [Trooper Munoz's] testimony [that he observed the vehicle traveling in excess of the posted speed limit] reliable and credible."  United States v. Abarca, Case No. 1:12cr29-MW/GRJ, 2014 WL 12641951, at *6 (N.D. Fla. Nov. 20, 2014); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are "within the province of the factfinder").  An officer's observations can supply probable cause "to conduct the traffic stop for speeding," United States v. Acosta, 807 F. Supp. 2d 1154, 1196 (N.D. Ga. 2011) (citations omitted); see also United States v. Thomas, CRIMINAL ACTION NO. 2:17-CR-28-RWS-JCF, 2019 WL 168672, at *1 (N.D. Ga. Jan. 11, 2019) ("agree[ing] with the [report and recommendation] that Deputy Holcomb had probable cause to stop Defendant's vehicle based on his observation of the vehicle . . . speeding in violation of O.C.G.A. § 40-6-181"); United States v. Shirley, Criminal Action File No. 1:10-CR-167-JEC/AJB, 2010 WL 5390138, at *5 (N.D. Ga. Nov. 10, 2010), adopted by 2010 WL 5390133, at *1 (N.D. Ga. Dec. 22, 2010)

(citations omitted) (finding officer "had probable cause to believe that [defendant] was violating Georgia law regarding maximum speed limits"); United States v. Griffin, Criminal Action File No. 2:10-CR-016-RWS-SSC, 2010 WL 6815894, at *5 (N.D. Ga. Sept. 8, 2010), adopted by 2011 WL 2518808, at *1 (N.D. Ga. June 24, 2011) (citation omitted) (finding "the uncontradicted evidence show[ed] Officer Parker had probable cause to stop the Lincoln because he observed it traveling at speeds in excess of the posted speed limit"), and the "Eleventh Circuit has concluded that an officer has probable cause to stop a vehicle for speeding based on pacing," United States v. Berkley, No. 1:13–cr–157–WSD–01, 2013 WL 6858920, at *3 (N.D. Ga. Dec. 30, 2013) (citing Rowls, 402 F. App'x at 468-69); see also Griffin, 2010 WL 6815894, at *5 (finding officer's testimony that defendant's vehicle "was driving in excess of the speed limit[ ]" was credible "based on [the officer's] observation that the [vehicle] was passing by other vehicles, his experience and training in visual estimations of speed, and his observation of the [vehicle's] speed while he 'paced' it by traveling behind it"), which is "all that is necessary to conduct a traffic stop," United States v. Alvardo, No. 8:10-CR-348-T-30TGW, 2010 WL 5262736, at *5 (M.D. Fla. Nov. 17, 2010), adopted by 2010 WL 5262735, at *1 (M.D. Fla. Dec. 17, 2010) (citing Whren, 517 U.S. at 810).  Thus, the Court finds that Trooper Munoz had probable cause "to stop the [vehicle] for speeding in violation of O.C.G.A. § 40–6–

19

181."  United States v. Latimore, Criminal Action File No. 1:13-cr-287-TCB, 2014 WL 3109183, at *15 (N.D. Ga. July 7, 2014) (footnote omitted); see also O.C.G.A. § 40-6-181.  "The initial traffic stop of the [vehicle] was therefore reasonable and not in violation of the Fourth Amendment."  United States v. Martinez-Blanco, CRIMINAL ACTION No. 1:06-CR-396 MHS, 2008 WL 11449038, at *1 (N.D. Ga. May 8, 2008), adopted by 2008 WL 11449039, at *1 (N.D. Ga. June 10, 2008).

**2.    *Scope and Duration of the Traffic Stop***

Defendants next contend that, even if their vehicle was lawfully stopped for speeding, "the encounter soon went too far," [Doc. 56 at 7 (citations omitted)], as a routine traffic stop was illegally prolonged without reasonable suspicion and resulted in an unlawful search of the vehicle, [Doc. 52 at 3].  The government responds that the length of the traffic stop was not unreasonable since Trooper Munoz had articulable suspicion that the defendants were engaged in other illegal activity, and he diligently pursued his duties in conducting the traffic stop and investigating his reasonable suspicion, including conducting a consent search of the vehicle.  [Doc. 59 at 17-18].

Even though an officer may have justification to initiate a traffic stop, the ensuing detention of a vehicle's occupant must not be excessively intrusive in that the officer's actions "must be 'reasonably related in scope to the circumstances

which justified the interference in the first place.'"  United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry, 392 U.S. at 20); see also United States v. Cantu, 227 F. App'x 783, 785 (11th Cir. 2007) (per curiam) (unpublished).  The stop must be of limited duration and "the stop may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity."  United States v. Garcia, 284 F. App'x 791, 794 (11th Cir. 2008) (per curiam) (unpublished) (citation and internal marks omitted).  The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop."  Purcell, 236 F.3d at 1277 (quoting United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997) (per curiam)).  "Asking questions while in the process of writing out a citation or awaiting the response of a computer check, however, does not extend the duration or scope of a valid initial seizure."  Garcia, 284 F. App'x at 794 (citing Purcell, 236 F.3d at 1279-80); see also Acosta, 807 F. Supp. 2d at 1196-97 (footnote and citations omitted) ("The duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver.").  In fact, "[t]he officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not prolong beyond the time reasonably required

to complete that mission." <u>Cantu</u>, 227 F. App'x at 785 (alteration, citation, and internal marks omitted).[15]

"Ordinarily, when a citation or warning has been issued and all record checks have been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled." <u>Edenilson-Reyes</u>, 2010 WL 5620439, at *10 (citation and internal marks omitted). "However, a traffic stop may last longer than the purpose of the stop would ordinarily permit if an officer, based on specific facts and rational inferences drawn from those facts in light of his training and experience, has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." <u>United States v. DeJesus</u>, 435 F. App'x 895, 900 (11th Cir. 2011) (per curiam) (unpublished) (citations omitted). That is, "[a]n investigative stop can grow out of a traffic stop so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop." <u>United States v. Gomez Serena</u>, 368 F.3d 1037, 1041 (8th Cir. 2004) (citation omitted). As

---

[15] That is, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." <u>Arizona v. Johnson</u>, 555 U.S. 323, 333 (2009) (citation omitted).

the Supreme Court has held, "[a] seizure justified only by a police-observed traffic violation . . . become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation," absent either reasonable suspicion or consent.  Rodriguez v. United States, 135 S. Ct. 1609, 1612-13 (2015) (all but first alteration in original) (citation and internal marks omitted).

After stopping the vehicle in which defendants were traveling, Trooper Munoz approached the passenger side and requested to see Jose's driver's license. (Gov. Ex. 4 at 2:52-3:00).  He quickly ascertained that the occupants of the vehicle did not speak English.  (Gov. Ex. 4 at 3:02-3:06).  He informed Jose that he stopped him for speeding and asked Jose to exit the vehicle to speak with him.  (Gov. Ex. 4 at 3:13-3:20).  Jose exited his vehicle and stepped to the rear of it where Trooper Munoz met him and asked if he had any "pistolas" on him and briefly frisked Jose for any weapons.  (Gov. Ex. 4 at 3:32-3:46).  Trooper Munoz then asked if Jose had proof of insurance, and after a brief exchange attempting to understand each other, Jose stepped to the passenger side of the vehicle and reached inside around the area of the glove compartment.  (Gov. Ex. 4 at 3:47-4:05).  Jose then handed some documents to Trooper Munoz, who thanked him and motioned for Jose to enter

the passenger side of his patrol car, while Trooper Munoz entered the driver's side. (Gov. Ex. 4 at 4:05-4:35)

Once seated inside the patrol car, Trooper Munoz accessed a translation application on his cell phone to facilitate communicating with Jose, and using the application, he conversed with him about the reason for the traffic stop. (Gov. Ex. 4 at 4:35-6:30). Trooper Munoz explained to Jose that he had been speeding in a construction zone, going approximately 70 miles per hour when the speed limit was 60 miles per hour. (Gov. Ex. 4 at 6:40-7:52). He then asked Jose about the purpose of his travel and his destination, and Jose explained that he had traveled from Mexico to Houston, Texas, to visit his brother, Hector, and they were driving to Atlanta to visit a cousin and planned to stay two nights. (Gov. Ex. 4 at 8:34-10:10). At approximately 15 minutes into the stop, Trooper Munoz asked Jose if he had anything illegal in the vehicle, and Jose responded using the translation application that he did not, and he indicated that Trooper Munoz could look in all of the vehicle, and Trooper Munoz then asked if Jose was giving him consent to search the vehicle, and Jose indicated in the affirmative. (Gov. Ex. 4 at 14:48-15:21). Moments later, Trooper Munoz told Jose that he was going to give him a warning for speeding and explained to him that he needed to pay attention to signs posted in the construction zone showing a lower speed limit and to abide by the reduced

24

speed limit.  (Gov. Ex. 4 at 15:26-16:39).  At approximately 18 minutes into the stop, Trooper Munoz told Jose that he would prepare his warning.  (Gov. Ex. 4 at 18:04). Trooper Munoz experienced some delay while using the equipment in his patrol car to prepare the warning, and he also had some difficulty reading the information on the driver's license and other documents Jose had provided because they were in a foreign language.   (Gov. Ex. 4 at 20:04-23:15).   At approximately 27 minutes into the stop, Trooper Munoz explained that the whole system was down, and he apologized for the delay caused by the difficulty he was having in processing the foreign documents.  (Gov. Ex. 4 at 27:13-28:05).

At approximately 32 minutes into the stop, Trooper Munoz printed the warning and a consent to search form in Spanish and presented the form to Jose to read, using the translation application to explain it to him.  (Gov. Ex. 4 at 32:03-34:07).  Jose declined to sign the consent to search form but indicated that Trooper Munoz could still search the vehicle.  (Gov. Ex. 4 at 34:07-35:33).  At approximately 35 minutes into the stop, Trooper Munoz asked Jose to exit the patrol car and stand at the front right side of the patrol car.  (Gov. Ex. 4 at 35:38-36:52).  Trooper Munoz then had the passenger, Hector, exit the vehicle and stand on the shoulder of the interstate with Jose as he commenced his search of the vehicle.  (Gov. Ex. 4 at 36:57-37:19).   Other law enforcement officers arrived on the scene, including TFO

Cultarevic, who served as a translator for Trooper Munoz and other officers who communicated with the defendants during the search of the vehicle. (Gov. Ex. 4 at 37:19-52:25)

Trooper Munoz first searched the interior of the vehicle and then the trunk. (Gov. Ex. 4 at 37:45-40:10). After removing some luggage and other items from the trunk, Trooper Munoz observed a cylinder similar to one depicted in a photograph from the Chicago seizure that the DEA had provided to him prior to the traffic stop. (Gov. Ex. 4 at 40:15-42:37). With translation assistance from TFO Cultarevic, Trooper Munoz asked the defendants who owned the cylinder, and Hector indicated it was his and said he used it in a machine shop in Houston. (Gov. Ex. 4 at 42:37-44:48). Trooper Munoz asked Hector about the purpose of his travel, and when Hector said they were going to visit a cousin in Atlanta, he found it suspicious that Hector would bring the cylinder on the trip, and he asked further questions about the cylinder, before eventually asking for permission to cut the cylinder open, and Hector gave verbal consent. (Gov. Ex. 4 at 44:50-47:33).

After obtaining consent to open the cylinder, Trooper Munoz determined it would need to be transported to a nearby fire station to have the necessary tools to cut it open, instead of attempting to open it on the shoulder of the interstate. (Gov. Ex. 4 at 50:04-50:40). Trooper Munoz initially requested a tow truck for the

defendants' vehicle, and while waiting for the tow truck to arrive, another officer on the scene, had his drug detection dog conduct an open air sniff of the vehicle, and the dog alerted on the cylinder.  (Gov. Ex. 4 at 50:48-53:24).  Trooper Munoz then informed the defendants, who were still unrestrained on the shoulder of the interstate, that the dog had indicated that drugs were in the cylinder, and he said that's "no bueno" and subsequently informed the defendants that they were not under arrest, but were being detained until the cylinder could be opened at the fire station.  (Gov. Ex. 4 at 53:36-54:43).  The defendants remained unrestrained on the shoulder of the interstate while arrangements were made to transport the vehicle with the cylinder in the trunk to the fire station.  (Gov. Ex. 4 at 54:43-1:18:32).  Ultimately, Jose and Hector were placed in the back seat of another GSP patrol car to travel to the fire station, and instead of using a tow truck, another law enforcement officer drove their vehicle to the fire station.  (Gov. Ex. 4 at 1:18:32-1:21:50).  They departed the location of the traffic stop approximately one hour and twenty-two minutes after Trooper Munoz had initiated the stop, and the drive to the fire station took about fifteen minutes.  (Gov. Ex. 4 at 1:22:07-1:36:57).

Upon arriving at the fire station, the defendants remained in the back seat of the GSP patrol car, with the doors closed, but they were not handcuffed, for several hours while a search warrant was obtained and the cylinder was cut open.

(Tr. at 30, 79, 87, 124, 136-37).  There was a recording device in the patrol car that captured conversations between the defendants and others.  (Tr. at 87-88; Gov. Ex. 9; Gov. Ex. 9-A).  Once the cylinder was cut open, cocaine and heroin were found inside of it, and Trooper Munoz then approached the patrol car where the defendants remained seated, and he opened the door and made the "no bueno" comment, informing them that drugs had been found in the cylinder, and he showed them a photograph of the contents of the cylinder and closed the door.[16] (Tr. at 14, 65-66, 88, 95, 108).  Moments later, TFO Cultarevic opened the door to the patrol car and asked Hector for his cell phone passcode, which Hector provided by typing it into the phone.  (Tr. at 110, 122-23, 126-27; Gov. Ex. 9 at 2). The defendants were arrested after the discovery of the narcotics in the cylinder. (Tr. at 14).

In this case, the initial stop was legal, and Trooper Munoz "had the duty to investigate suspicious circumstances that then came to his attention."  Simmons,

---

[16] Trooper Munoz testified that he did not recall if either defendant said anything in response to his "no bueno" comment, (Tr. at 66), but according to the video recording and summary submitted as exhibits by the government, Hector said, "What? I don't know." (Gov. Ex. 9 at 2; Gov. Ex. 9-A at 1:02:35-40).  After Trooper Munoz closed the door to the patrol car, Hector said, "They opened it." (Gov. Ex. 9 at 2).

172 F.3d at 779 (second alteration in original) (citation and internal marks omitted).

Before he stopped the vehicle, Trooper Munoz already had some suspicion that

the vehicle may be involved in drug trafficking based on the information that had

been provided to him by DEA agents, including that the vehicle with a Mexican

license plate had been located by tracking the phone identified in the Chicago drug

transaction in which a cylinder with heroin inside had been delivered by

individuals suspected of being brothers who drove to Mexico after the transaction.

(Tr. at 7, 9-20, 45).  Trooper Munoz's suspicion that the defendants were engaged

in illegal activity was heightened by his observations subsequent to initiating the

traffic stop for speeding in a construction zone, as he noticed that the trunk

appeared to be weighted down and the driver drove in the emergency lane for an

inordinate distance before coming to a stop.  (Tr. at 52-53).  His conversation with

Jose about their travel plans and destination caused further suspicion, and when

Jose spontaneously offered to allow him to search the vehicle after Trooper Munoz

asked if he had anything illegal in the vehicle, Trooper Munoz proceeded to

conclude the traffic stop by preparing a warning for Jose for speeding and

promptly carried out his investigation by preparing a consent to search form in

the Spanish language that he presented to Jose.  (Tr. at 57-59; Gov. Ex. 10 at 5-14,

20, 23).  Although Jose did not sign the consent to search form, he reiterated that

Trooper Munoz could search the vehicle, and Trooper Munoz proceeded to do so, which led to the discovery of the cylinder in the trunk that appeared similar to the one used in the Chicago transaction at approximately 45 minutes into the stop, which supplied reasonable suspicion to prolong the stop for further investigation. (Tr. at 59-62, 85, 94-95; Gov. Ex. 4; Gov. Ex. 10 at 23-25).   Trooper Munoz asked Hector questions about the cylinder and his travel plans after Hector indicated the cylinder belonged to him.  (Tr. at 62-63, 106).  Hector's responses to his questions did not dispel Trooper Munoz's reasonable suspicion that the defendants may be transporting narcotics in the cylinder, so he asked Hector for consent to cut open the cylinder to look inside, which Hector granted.  (Tr. at 79; Gov. Ex. 4 at 47:32).  Trooper Munoz's reasonable suspicion ripened into probable cause once the drug dog alerted on the cylinder at approximately 50 minutes into the stop, and law enforcement agents reasonably proceeded to obtain a search warrant for the cylinder and to move from the shoulder of the interstate to the fire station to further their investigation, while detaining the defendants.  (Tr. at 78, 87-89, 150-51, 153; Gov. Exs. 5 & 6).

Defendants argue that the duration of the stop was excessive.  [Doc. 52 at 4-5; Doc. 56 at 7-12].  "[T]he length of the delay consumed in the conduct of the investigative detention must have been 'sufficiently limited in scope and duration

to remain within the bounds' permitted by *Terry*." Simmons, 172 F.3d at 780 (quoting United States v. Hardy, 855 F.2d 753, 758 (11th Cir. 1988)). "Several issues and circumstances are relevant to this analysis, including 'the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.'" Id. (quoting Hardy, 855 F.3d at 758); see also United States v. Hernandez, Criminal Case No. 1:12-CR-00322-AT-JFK, 2013 WL 7035606, at *7 (N.D. Ga. Aug. 12, 2013), adopted as modified by 2014 WL 111211, at *1 (N.D. Ga. Jan. 13, 2014).

As to the first factor, the law enforcement purpose served by prolonging the stop beyond the initial traffic offense was to confirm or dispel the reasonable suspicion that the defendants may be engaged in illegal activity by completing a search of the vehicle after Jose had spontaneously offered to allow Trooper Munoz to search the vehicle. "Turning to the next factor, the undersigned finds that the detention was not unreasonable in scope or intrusiveness." United States v. Aguiar, Criminal Indictment No. 2:05-CR-021-WCO, 2006 WL 8440907, at *8 (N.D. Ga. Nov. 21, 2006), adopted by 2007 WL 9724572, at *7 (N.D. Ga. Jan. 10, 2007). Trooper Munoz promptly began the search of the vehicle following Jose's consent by looking in the interior of the vehicle and quickly moved to the trunk where he

31

removed suitcases and other items and discovered the cylinder. (Tr. at 61; Gov. Ex. 10 at 25). The defendants were either standing or seated unrestrained on the shoulder of the interstate while Trooper Munoz conducted the search in their presence without removing panels or causing any damage to the vehicle. (Gov. Ex. 4 at 37:00-1:18:32). Trooper Munoz conversed with the defendants as he conducted the search, asking reasonable questions about their travel and the purpose of the cylinder, and he explained his suspicion to them, informing them that the drug dog had alerted on the cylinder for the presence of narcotics, and he told them that although they were not under arrest, they were being detained for further investigation of the cylinder. (Tr. at 61-64; Gov. Ex. 4 at 54:20).

Finally, the duration of the stop was reasonable. "There is no rigid time limitation or bright line rule regarding the permissible duration of a *Terry* stop," United States v. Nuckles, Criminal Case No. 1:14–CR–218–ODE–AJB, 2015 WL 1600687, at *17 (N.D. Ga. Apr. 7, 2015), adopted at *9, aff'd, 649 F. App'x 834 (11th Cir. 2016) (per curiam) (unpublished) (citation and internal marks omitted), "but detentions of less than one hour have been repeatedly upheld as reasonable," id. (collecting cases). Trooper Munoz discovered the cylinder at approximately 45 minutes into the stop, only ten minutes after completing the purpose of the initial traffic stop by issuing Jose a warning. Moreover, the drug dog alerted at

approximately 50 minutes into the stop, and "the intervening development of probable cause based upon the dog's alert" obviates the need to determine whether the continued detention of the defendants to open the cylinder "would have been reasonable." Simmons, 172 F.3d at 781. In sum, the Court concludes that the purpose of the detention, Trooper Munoz's diligence in completing the consent search to confirm or dispel his reasonable suspicion of illegal activity, "the limited scope of the continued detention beyond that warranted for a 'normal traffic stop,' and the overall length of the total detention, all place [defendants'] detention well within the bounds permitted by *Terry v. Ohio* and its progeny." Id.

### 3. *Consent to Search*

The government argues that even if the stop had been unlawfully prolonged, Jose's consent to search the vehicle purged any taint and "mooted any argument that the search of the rental car was illegal." [Doc. 59 at 15 n.6]. Jose contends that his "consent was not knowing and voluntary, but mere acquiescence to a show of lawful authority." [Doc. 56 at 13]. Jose asserts that his consent was not valid because it was obtained "after the stop had already been prolonged unnecessarily," Trooper Munoz "did not use a verified translation service, interpreter or app to gain the consent," and he "ask[ed] for permission to search the car but did not tell Jose he could refuse." [Id.].

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. Const. amend. IV.   "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"   Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 454-455 (1971); Katz v. United States, 389 U.S. 347, 357 (1967)).   "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent."   United States v. Garcia,  890 F.2d 355, 360 (11th Cir. 1989).   "An officer conducting a routine traffic stop may request consent to search the vehicle."   United States v. Harris, 526 F.3d 1334, 1339 (11th Cir. 2008) (per curiam) (citation and internal marks omitted).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."   Garcia, 890 F.2d at 360. "[T]he principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession– i.e. whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances."   United States v. Boskic, Criminal No. 04-10298-DPW, 2006

34

WL 1540488, at *19 (D. Mass. June 2, 2006), <u>aff'd</u>, 545 F.3d 69 (1st Cir. 2008) (citation

and internal marks omitted); <u>see also</u> <u>United States v. Tovar-Rico</u>, 61 F.3d 1529,

1535 (11th Cir. 1995) (noting voluntariness of consent is judged in light of the

totality of the circumstances).  Relevant factors include the presence of coercive

police procedures, the extent of the person's cooperation with the officer, the

person's awareness of his right to refuse consent, the person's education and

intelligence, and the person's belief that no incriminating evidence will be found.

<u>Purcell</u>, 236 F.3d at 1281; <u>see also</u> <u>United States v. Chaidez-Reyes</u>, Criminal Action

No. 1:13-CR-158-ODE-AJB, 2014 WL 547178, at *15 (N.D. Ga. Feb. 10, 2014),

adopted at *1.  Ultimately, the burden is on the government to prove that the

consent was given voluntarily.  <u>United States v. Bentley</u>, 151 F. App'x 824, 827

(11th Cir. 2005) (per curiam) (unpublished) (quoting <u>United States v. Chemaly</u>, 741

F.2d 1346, 1352 (11th Cir. 1984)); <u>Tovar-Rico</u>, 61 F.3d at 1536 (quoting <u>Florida v.</u>

<u>Royer</u>, 460 U.S. 491, 497 (1983)); <u>United States v. Blake</u>, 888 F.2d 795, 798 (11th Cir.

1989).

"The [g]overnment has met its burden of demonstrating that [Jose]

voluntarily consented to the search of his vehicle."  <u>United States v. Gibbs</u>,

CRIMINAL INDICTMENT NO.: 2:17-CR-00005-RWS-JCF, 2018 WL 1916627, at *4

(N.D. Ga. Mar. 14, 2018), adopted by 2018 WL 1915080, at *1 (N.D. Ga. Apr. 23,

2018).  Trooper Munoz testified that Jose offered to let him search the vehicle even before he asked for consent to search, and Trooper Munoz's testimony was consistent with the video recording of the traffic stop, which shows that Jose spontaneously said you can look in it after Trooper Munoz asked if he was carrying anything illegal in the vehicle.  (Tr. at 57-59; Gov. Ex. 10 at 5-14, 20, 23; Gov. Ex. 4).  After Trooper Munoz confirmed that Jose gave him permission to search the vehicle, he printed a consent to search form in Spanish and presented it to Jose to read.  (Tr. at 59).  Although Jose declined to sign the consent to search form, he reiterated that Trooper Munoz could search the vehicle.  (Tr. at 59-60, 85, 94-95; Gov. Ex. 10 at 23-25).  The video also shows that Trooper Munoz used a casual, conversational tone, did not draw his weapon, did not use physical force or restrain Jose, and had not threatened him in any way, but simply had him sit in the front passenger seat of his patrol car so they could converse using the translation application on his cell phone.  See (Tr. at 63-64; Gov. Ex. 4 at 3:31–36:10); see also United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999) (alterations in original) (citation omitted) ("'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.'").

36

Contrary to Jose's contention, his consent was not rendered involuntary because he was asked to exit his vehicle and sit in the front passenger seat of the patrol car.  See United States v. Perry, 522 F. App'x 821, 826 (11th Cir. 2013) (per curiam) (unpublished) (citation omitted) ("determining that consent to search vehicle was voluntary when an officer possessed defendant's license, but did not threaten violence or suggest that the defendant could not refuse"); Spoerke, 568 F.3d at 1248 (citations and internal marks omitted) ("During a lawful traffic stop, officers [] may take steps that are reasonably necessary to protect their personal safety, including requiring the driver and passengers to exit the vehicle as a matter of course."); United States v. Betancourt, Case No. 3:18-cr-087, 2019 WL 2928888, at *5 (S.D. Ohio July 8, 2019) (citations omitted) ("Furthermore, officers may ask a driver to sit in a cruiser during the completion of the traffic investigation and citation process."); United States v. Randall, 211 F. Supp. 2d 1127, 1132 (D. Neb. 2001) (citation omitted) ("When the officer observes a vehicle traveling in excess of the permitted highway speed set by law, the automobile or its occupants can be lawfully stopped and the driver asked to accompany the officer to the patrol car, even if the officer is planning to issue only a warning ticket."); see also United States v. Barnum, 564 F.3d 964, 970 (8th Cir. 2009) (citations omitted) ("[T]he mere presence of 'two to three officers being armed with holstered firearms,' in the

37

absence of evidence of threats or intimidation, does not negate a defendant's consent."). Nor is there any indication in the record that Trooper Munoz's use of a translation application on his cell phone rendered Jose's consent invalid. The video of the traffic stop shows that Trooper Munoz was able to effectively communicate with Jose by using the translation application.[17]   United States v. Garcia-Garcia, 957 F.3d 887, 894–95 (8th Cir. 2020) (citation omitted) ("The relative ease with which [the defendant] and [the officer] communicated using the translation application further supports the district court's finding that it was reasonable for [the officer] to believe [the defendant] consented based in part on a request using the term *bolsa*—a translation produced by the application."); United States v. Rivas, CRIMINAL ACTION NO. 16-00272-KD-N, 2017 WL 957387, at *5 (S.D. Ala. Mar. 10, 2017), aff'd, 746 F. App'x 826 (11th Cir. 2018) (per curiam) (unpublished) (officer's use of computer translation to communicate with defendant during traffic stop did not unreasonably prolong stop). Moreover, the government submitted as an exhibit at the evidentiary hearing a translation of

---

[17] For example, when they did not understand each other concerning how long Jose had stayed in Houston before leaving for Atlanta, both persisted in using the translation application to clarify Jose's answer. See (Gov. Ex. 4 at 10:18-13:02).

relevant excerpts of the recorded conversation between Trooper Munoz and Jose prepared by a certified interpreter, which clearly indicates that Jose verbally consented to the search of the vehicle during his conversation with Trooper Munoz.  (Tr. at 157-58; Gov. Ex. 10 at 10-11, 23-24).[18]

Furthermore, Jose and Hector stood or sat unrestrained on the shoulder of the interstate and observed Trooper Munoz conduct the search of the vehicle, and neither of them voiced any objection or rescinded the consent Jose had provided. (Gov. Ex. 4 at 35:38-47:33).  Indeed, when Trooper Munoz located the cylinder, he asked to whom it belonged, and when Hector said it was his, he asked for consent to cut it open, and Hector gave verbal consent for him to do so.  (Gov. Ex. 4 at

---

[18] Jose complains that Trooper Munoz did not inform him that he could decline to consent to the search of the vehicle, [Doc. 56 at 13], but "[t]he Supreme Court has rejected the argument that consent to a search cannot be valid unless the defendant knew that he had a right to refuse the request: '[J]ust as it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning, so too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary.'"  United States v. Crump, Criminal Action File No. 4:10–CR–032–HLM–WEJ, 2011 WL 6153106, at *6 n.13 (N.D. Ga. Nov. 21, 2011), adopted by 2011 WL 6179211, at * (N.D. Ga. Dec. 12, 2011) (second alteration in original) (citation and internal marks omitted); see also Zapata, 180 F.3d at 1242 (citations omitted) ("The mere fact that [the officer] did not inform [the defendant] of his right to refuse consent, given the lack of any coercive behavior on [the officer's] part, is insufficient to render [the defendant's] consent involuntary.").

42:37-47:33).   "Considering the totality of these facts and circumstances, and comparing this encounter to more coercive circumstances that have nonetheless been found to be consensual, the Court finds that [Jose] freely and voluntarily consented to a search of the [vehicle]."  United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1338 (N.D. Ga. 2009), adopted at 1326 (citations omitted); see also United States v. Brown, 223 F. App'x 875, 880 (11th Cir. 2007) (per curiam) (unpublished) (finding consent to search voluntary despite the fact that officer had drawn his weapon and placed defendant in handcuffs); United States v. Hidalgo, 7 F.3d 1566, 1567, 1571 (11th Cir. 1993) (finding consent voluntary where defendant was arrested by law enforcement who had broken into his home early in the morning, woke him up, and forced him to the ground at gun point); Garcia, 890 F.2d at 361 (holding consent voluntary where defendant was arrested by numerous officers, was patted down for weapons, was handcuffed, and where the officers refused to accept defendant's conditional consent to search and threatened to obtain a search warrant if he did not consent to a full search).  Accordingly, because the undersigned finds that the traffic stop and subsequent search of the vehicle did not violate the Fourth Amendment, it is **RECOMMENDED** that defendants' motions to suppress evidence obtained as a result of the stop and search be **DENIED**.

**B.**   **Motions to Suppress Statements, [Docs. 30 & 33]**

Both defendants move to suppress statements they made during the stop and search of the vehicle and while they were seated in the back seat of the patrol car.  [Docs. 30 & 33].  Jose complains that he was never Mirandized despite being detained and interrogated and subjected to the functional equivalent of interrogation while in the back seat of the patrol car when Trooper Munoz opened the car door after finding the narcotics and saying, "'no [b]ueno.'"  [Doc. 56 at 14-15].  Hector similarly contends that he was not Mirandized until the day following his arrest, and he argues that "all the questions he answered after his arrest at the traffic stop and later at the Coweta Fire Department, which included *inter alia*, answers about the cylinder, his machine shop experience and providing the password to his cell phone, should be suppressed."  [Doc. 52 at 6].

"Generally, the government may not use statements obtained as a result of custodial interrogation by law enforcement officers, unless the defendant has been advised of, and validly waived, his rights to remain silent and to the presence of retained or appointed counsel during questioning."  United States v. Martin, No. 1:14–CR–00427–ELR, 2015 WL 4664889, at *12 (N.D. Ga. Aug. 6, 2015), adopted at *5 (citation omitted).  "An officer's obligation to administer Miranda warnings attaches . . . 'only where there has been such a restriction on a person's freedom as

41

to render him in custody.'"   <u>United States v. de los Santos</u>, No. 1:05-cr-372-WSD, 2007 WL 2331070, at *5 (N.D. Ga. Aug. 13, 2007), adopted at *2 (citation and internal marks omitted); <u>see also</u> <u>Garcia v. Singletary</u>, 13 F.3d 1487, 1489 (11th Cir. 1994) (citation omitted) ("A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.").  Thus, "*Miranda* warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." <u>United States v. Adams</u>, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation and internal marks omitted).[19]

---

[19]  In <u>Miranda</u>, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. at 467.  Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, <u>Miranda</u> established certain procedures officers must follow. Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires."  <u>Id.</u> at 467-70.  <u>Miranda</u> further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  <u>Id.</u> at 473-74 (footnote omitted).  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  <u>Id.</u> at 474.

However, "*Miranda* was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from 'express questioning or its functional equivalent.'"   United States v. Springfield, No. CR406-390, 2007 WL 1140912, at *3 (S.D. Ga. Apr. 13, 2007), adopted by 2007 WL 1302282, at *1 (S.D. Ga. May 1, 2007) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)).   Thus, the "special procedural safeguards outlined in *Miranda* are required . . . where a suspect in custody is subjected to interrogation," which "must reflect a measure of compulsion above and beyond that inherent in custody itself."   Innis, 446 U.S. at 300 (footnote omitted). Defendants bear the burden of establishing that they were in custody and that their statements were made in response to government questioning.  See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).[20]   The government bears the burden of proving that defendants' statements were voluntarily given.  Colorado v. Connelly, 479 U.S. 157, 168 (1986).

---

[20] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

1.    *Jose's Statements*

Jose contends that he was subjected to custodial interrogation when he was "removed from his own vehicle, placed in a patrol car and questioned" by Trooper Munoz.  [Doc. 56 at 14].  He also asserts that "[Trooper] Munoz and other officers at the scene asked a wide-variety of questions geared to eliciting incriminating information, including where Jose had come from, where he was going[,] how long he was planning to stay, where the cylinder came from, and more."  [Id.].  Jose further argues that "[Trooper] Munoz also sought to generate incriminating statements by showing the brothers the photo of the drugs and saying 'no [b]ueno,'" while they were in the back seat of the patrol car, engaging in the functional equivalent of interrogation because "[h]e knew the car would record audio of what they said after he provoked them with the photo."  [Id. at 15 (citations omitted)].

### a.    Statements made in Trooper Munoz's patrol car

The statements Jose made following the traffic stop after exiting his vehicle and while seated in the front passenger seat of Trooper's Munoz's patrol car are not subject to suppression because they were not the product of custodial interrogation.  As previously noted, Trooper Munoz was authorized to ask Jose to exit his own vehicle in connection with the lawful traffic stop and to ask him

44

questions pertaining to the stop, including questions about his travel plans and destination.  See United States v. Warnock, CRIMINAL CASE NO. 1:14-cr-00015-AT-RGV, 2016 WL 11521783, at *9 (N.D. Ga. Oct. 12, 2016), adopted as modified by 2018 WL 4927722, at *7 (N.D. Ga. Oct. 11, 2018) (first alteration in original) (citations and internal marks omitted) (noting that "[i]t [was] well established that an officer [was] free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during the course of a traffic stop"); United States v. Swann, No. 4:14–mj–0102–MSH, 2014 WL 6605610, at *3 (M.D. Ga. Nov. 20, 2014) (citation omitted) (explaining that "the Supreme Court has squarely held that any inconvenience caused by asking a driver to exit his vehicle [was] *de minimus* when compared to the issue of the safety of both driver and officer" and that "[t]his step [was] also not an extension of [a] routine traffic stop").  The fact that Trooper Munoz had Jose sit in the front seat of his patrol car to facilitate their communication using the translation application on his cell phone did not convert the encounter into a custodial interrogation.  See United States v. Graves, 545 F. App'x 230, 237 (4th Cir. 2013) (per curiam) (unpublished) (concluding that the fact that the defendant was questioned while inside of a patrol car did not transform the encounter into a custodial one); United States v. Iturbe-Gonzalez, 100 F. Supp. 3d 1030, 1037 (D. Mont. 2015), aff'd, 705 F. App'x 486 (9th Cir. 2017) (last alteration

in original) (citation and internal marks omitted) (finding that the officer "did not need to *Mirandize* [defendant, who was seated in the front seat of the officer's patrol car,] during the . . . period during which he diligently worked to process the traffic violation," since "the coercive concerns that motivate the need to issue Miranda warnings were not present" and "[t]he fact that [defendant] was seated in the patrol car did not take this encounter outside of the scope of the ordinary traffic stop [that] is substantially less police dominated than that surrounding the kinds of interrogation at issue in *Miranda*"); United States v. Francis, CRIMINAL ACTION FILE NO. 1:05-CR-254-JTC/AJB, 2007 WL 9718918, at *14 (N.D. Ga. Feb. 16, 2007), adopted by 2007 WL 9718917, at *4 (N.D. Ga. Oct. 3, 2007) (footnote and citations omitted) (explaining that "directing [defendant] to enter the front seat of his patrol car and questioning him in the police vehicle did not automatically transform a legitimate, limited traffic stop into an in-custody, *de facto* arrest requiring the heightened requirement of probable cause").  A reasonable person in Jose's circumstances would not regard sitting unrestrained in the front seat of a patrol car as the functional equivalent of being arrested.  See United States v. Speal, 166 F.3d 350, 1998 WL 886757, at *5 (10th Cir. 1998) (unpublished) (finding defendant was not "in custody" during pre-Miranda detention in patrol car following traffic stop when there was no evidence of coercion by the officer, the

46

conversation took place in the front seat of the patrol car on the shoulder of a public highway, the conversation was not excessive in length, defendant was unrestrained and within eyesight of his companion, and it was a windy and chilly day which justified the relocation).  Therefore, Trooper Munoz was not required to administer <u>Miranda</u> warnings to Jose while asking him questions in connection with the traffic stop and obtaining consent to search his vehicle.

**b.    Statements on shoulder of interstate during search of vehicle**

Jose also contends that "[Trooper] Munoz and other officers on the scene asked a wide-variety of questions geared to eliciting incriminating information, including where Jose had come from, where he was going[,] how long he was planning to stay, where the cylinder came from, and more."  [Doc. 56 at 14]. According to the video recording of the stop, the only interaction other officers had with Jose occurred after he exited the front seat of Trooper Munoz's patrol car and stood along the shoulder of the interstate as Trooper Munoz conducted the search of the vehicle.  Jose has not identified any specific statements he made during this period of the stop that were posed by officers other than Trooper Munoz that he contends should be suppressed.  <u>United States v. Jaunich</u>, Criminal No. 13–183 (JRT/LIB), 2014 WL 1026331, at *21 (D. Minn. Mar. 14, 2014) (denying motion to suppress statements where defendant "failed to identify any specific

statements he made while in the custody of law enforcement, which would be the subject of his suppression motion."). TFO Cultarevic did serve as a translator for Trooper Munoz during the search of the vehicle, but it is not apparent from the testimony and evidence admitted during the evidentiary hearing that TFO Cultarevic or any other officer interrogated Jose at the scene of the stop. In any event, any questioning of Jose by Trooper Munoz or other officers on the scene of the stop during the search was not custodial interrogation subject to <u>Miranda</u> since Jose was not under arrest and stood unrestrained on the shoulder of the interstate while Trooper Munoz conducted the search of the vehicle to which Jose had consented. <u>See</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984); <u>United States v. Hernandez-Hernandez</u>, Case No: 2:15-cr-59-FtM-38MRM, 2015 WL 13741204, at *13 (M.D. Fla. Oct. 29, 2015), adopted by 2015 WL 9450849, at *6 (M.D. Fla. Dec. 28, 2015), <u>aff'd</u>, 689 F. App'x 907 (11th Cir. 2017) (per curiam) (unpublished) (internal citation omitted) ("By finding that there was probable cause that Defendant was engaged in illegal activity beyond a traffic violation, the nature of Defendant's detention did not change from a stop analogous to a 'Terry stop,' into a formal arrest requiring a *Miranda* warning.").

### c.   Statements in the back seat of the patrol car

Jose argues that Trooper Munoz functionally interrogated the defendants while they were in the back seat of the patrol car at the fire station when he opened the door to show them the photograph of the drugs found in the cylinder and made the "no bueno" comment to them, knowing that the recording device in the patrol car would record what they said. [Doc. 56 at 15]. However, Jose has not identified any statements he made while in the back seat of the patrol car after Trooper Munoz made the "no bueno" comment. Indeed, the evidence admitted at the evidentiary hearing does not disclose any incriminating statements Jose made while in the back seat of the patrol car. The summary of the recorded statements from the back seat of the patrol car admitted as Exhibit 9 reveals statements Hector made to Jose, but none that Jose made after Trooper Munoz opened the car door. Consequently, Jose has not identified any statements he made in the back seat of the patrol car that are subject to suppression.[21] Jaunich, 2014 WL 1026331, at *21; see also United States v. Deserly, Court File No. 17-cr-217

---

[21] Nevertheless, the Court will address whether Trooper Munoz's actions and "no bueno" comment constituted the functional equivalent of interrogation in connection with discussing Hector's motion to suppress statements he made in the back seat of the patrol car.

(WMW/LIB), 2017 WL 8787046, at *7 (D. Minn. Dec. 5, 2017), adopted by 2018 WL 740386, at * (D. Minn. Feb. 7, 2018) (citations omitted) (recommending that "[b]ecause [d]efendant ha[d] offered no sufficiently specific factual or legal grounds for suppression of any of her statements, nor even identified any specific statements she made which she believe[d] should be suppressed," her motion to suppress statements be "summarily den[ied] on the basis that [d]efendant [] failed to meet her burden of production").

### 2.   *Hector's Statements*

#### a.   **Statements on shoulder of interstate during search of vehicle**

Hector moves to suppress all statements he made after his arrest at the traffic stop on January 25, 2019, since he was not Mirandized until his interview on the following day.  [Doc. 52 at 5].  Hector asserts that "[w]hile the exact point of [his] arrest on January 25, 2019 may be subject to dispute, it cannot seriously be argued that he was not under arrest once placed in the GSP patrol car and removed from the scene of the traffic stop."  [Id.].  Specifically, he contends that "all the questions he answered after his arrest at the traffic stop and later at the Coweta Fire Department, which included *inter alia*, answers about the cylinder, his machine shop experience and providing the password to his cell phone, should be suppressed."  [Id. at 6].  The government disputes that Hector was subjected to

any custodial interrogation during the traffic stop and roadside search of the vehicle since he remained unrestrained throughout the stop and search and was either standing or seated in a chair on the shoulder of the interstate until he and Jose were informed that they were being detained approximately 54 minutes into the stop, and "[t]here was no questioning of substance that took place after this point." [Doc. 59 at 20 & n.10].

Other than Trooper Munoz's initial approach to the vehicle after making the stop, he did not have any interaction with Hector until he began the search of the vehicle by asking Hector to exit the passenger seat and stand at the rear of the vehicle with Jose. (Gov. Ex. 4 at 02:52-37:15). Hector stood close by, unrestrained and in public view on the shoulder of the interstate watching as Trooper Munoz conducted his search of the vehicle. (Gov. Ex. 4 at 38:05-42:39). Other officers arrived on the scene and were standing in the vicinity of the defendants during the search of the vehicle, but there is no indication in the record that any of those officers had any substantive conversation with either defendant until Trooper Munoz found the cylinder in the trunk. (Gov. Ex. 4 at 37:20-42:49). Upon locating the cylinder, Trooper Munoz asked the defendants, with TFO Cultarevic serving as a translator, who owned the cylinder, and Hector indicated it belonged to him. (Tr. at 79, 106; Gov. Ex. 4 at 42:39-42:47). Trooper Munoz then asked Hector

additional questions about the cylinder, his business, and their travel plans as he remained unrestrained and seated in a chair on the shoulder of the interstate. (Gov. Ex. 4 at 42:47-46:57).   Contrary to Hector's contention, [Doc. 52 at 6], these questions were posed before Hector and Jose were informed that they were being detained and placed in the back seat of the patrol car.  The government asserts that "[u]nder similar circumstances involving a stop in a public place, no restraints, no physical force, and no significant use of weapons, the United States Court of Appeals for the Eleventh Circuit found that 'the stop did not involve the type of highly intrusive coercive atmosphere that may require *Miranda* warnings . . .' prior to questioning."  [Doc. 59 at 21 (internal marks omitted) (quoting United States v. Acosta, 363 F.3d 1141, 1150 (11th Cir. 2004))].  The Court agrees.

While there is no doubt that Trooper Munoz questioned Hector after he found the cylinder in the trunk, Hector has not demonstrated that he was in custody during this portion of the encounter.  Indeed, Hector does not even argue that he was in custody until he was placed in the back seat of the patrol car.  [Doc. 52 at 5-6].  The circumstances of the questioning during the roadside search of the vehicle in public view while Hector and Jose were unrestrained and without any use of weapons or force did not rise to a custodial interrogation requiring Miranda warnings.  Trooper Munoz was carrying out a lawful Terry stop and consensual

search of the vehicle in which Hector was a passenger, and he was authorized to ask the occupants of the vehicle questions about items he found during the search to either confirm or dispel his reasonable suspicion without first advising them of their <u>Miranda</u> rights since they were not in custody at the time.  <u>See</u> <u>Berkemer</u>, 468 U.S. at 440; <u>Hernandez-Hernandez</u>, 2015 WL 13741204, at *13.

### b.  Statements in the back seat of the patrol car

Hector moves to suppress all statements he made after he was placed in the back seat of the patrol car and removed from the scene of the stop, contending that "all the questions he answered after his arrest at the traffic stop and later at the Coweta Fire Department, which included *inter alia*, answers about the cylinder, his machine shop experience and providing the password to his cell phone, should be suppressed."  [Doc. 52 at 5-6].  As already discussed, the questions about the cylinder and his machine shop experience were posed while Hector was seated in a folding chair on the shoulder of the interstate while Trooper Munoz was conducting the consent search of the vehicle, not when he was in the patrol car. (Gov. Ex. 4 at 42:47-46:57).  The only substantive statements of record that Hector made after being placed in the back seat of the patrol car followed Trooper Munoz's "no bueno" comment to the defendants after the drugs were found in the

cylinder and when TFO Cultarevic asked for the password to his cell phone.  (Gov. Ex. 9 at 2).

Hector has not argued, and the record does not reveal, that Trooper Munoz interrogated him while he was in the back seat of the patrol car.  Instead, the only interaction Trooper Munoz had with Hector after he was placed in the patrol car came when he opened the car door and showed the defendants the photograph of the drugs found in the cylinder and said "no bueno" before closing the car door. (Tr. at 64-66, 88, 95-96; Gov. 9 at 2; Gov. 9-A at 1:02:30-1:02:45).  At best, Hector could contend, as did Jose, [Doc. 56 at 15], that Trooper Munoz's actions were the functional equivalent of interrogation.  However, Hector has not made this argument, see generally [Doc. 52], and even if he had, it would fail on the record before the Court.

The Supreme Court has defined the "functional equivalent" of interrogation as "'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  United States v. McKenzie, 132 F. App'x 788, 790 (11th Cir. 2005) (per curiam) (unpublished) (quoting Innis, 446 U.S. at 300-01).  "In determining whether an exchange was the functional equivalent of an interrogation, the focus of the inquiry is the perception of the suspect, not the

54

intent of the police." United States v. Suarez, 162 F. App'x 897, 901-02 (11th Cir. 2006) (per curiam) (unpublished) (citation omitted).

The mere fact that Hector and Jose were placed in the back seat of a patrol car "with a recording device activated, was not the functional equivalent of express questioning." United States v. Hernandez-Mendoza, 600 F.3d 971, 977 (8th Cir.), as amended (July 7, 2010), opinion amended on denial of reh'g, 611 F.3d 418 (8th Cir. 2010). There is no evidence that Trooper Munoz was engaged in some sort of "psychological ploy" to extract a statement from defendants. See United States v. Quiocho, No. 90–10217, 1991 WL 86873, at *2 (9th Cir. May 13, 1991) (unpublished) (rejecting suspect's assertion that agents "showed" him the evidence in order to elicit a statement); see also Innis, 446 U.S. at 301; United States v. Glover, 211 F. App'x 811, 814 (10th Cir. 2007) (unpublished) (admitting spontaneous statement made after being informed of grounds for arrest, holding that providing such information to a suspect "is prudent police practice and cannot objectively be construed as an attempt to elicit an incriminating response"). Throughout his interactions with the defendants after discovering the cylinder in the trunk of their vehicle, Trooper Munoz kept them apprised of developments, including sharing his suspicion that the cylinder contained drugs, that the drug dog had alerted on the cylinder, at which time he also said "no bueno," and that

they were being detained until the cylinder could be cut open.  (Gov. Ex. 4 at 46:04-47:10, 50:10-50:55, 52:32-53:55).  Thus, his actions in showing the defendants a photograph of the narcotics found in the cylinder and again commenting "no bueno" was consistent with his actions of keeping the defendants informed during the stop and search rather than a ploy reasonably likely to elicit a confession.  See United States v. Moreno-Flores, 33 F.3d 1164, 1169 (9th Cir. 1994) (officer's statement to the defendant that "agents had seized approximately 600 pounds of cocaine and that [he] was in serious trouble" was not an interrogation or its functional equivalent); United States v. Hodge, Criminal No. 2016-0009-03, 2017 WL 1345219, at *14 (D.V.I. Feb. 24, 2017) (holding that agent's quip that "this looks like a bad day for you," is a declaration indicating that the police had finally "caught" defendant and "he would soon have to face the consequences for his actions" which was not "reasonably likely to elicit an incriminating response from [defendant]" and therefore, not the functional equivalent of interrogation).

Hector also contends that TFO Cultarevic's request for the passcode to his cell phone at the fire station violated Miranda and his response should therefore be suppressed.  [Doc. 52 at 6].  "'An individual must show three things to fall within the ambit of the Fifth Amendment: (1) compulsion, (2) a testimonial communication or act, and (3) incrimination.'"  United States v. Sanchez, 334 F.

Supp. 3d 1284, 1294 (N.D. Ga. 2018) (quoting United States v. Doe (In re Grand Jury Subpoena Duces Tecum), 670 F.3d 1335, 1341 (11th Cir. 2012)); see also United States v. Aquino-Bustos, CRIMINAL ACTION NO. 1:18-CR-452-MHC-CCB, 2019 WL 7840667, at *11 (N.D. Ga. Nov. 21, 2019), adopted by 2020 WL 91500, at *9 (N.D. Ga. Jan. 7, 2020).   Although it is somewhat sparse, "case law indicates that production of cellphone passwords constitutes incriminatory testimony protected by the Fifth Amendment." Sanchez, 334 F. Supp. 3d at 1295 (footnote and citations omitted).   "The Fifth Amendment protects an individual from being compelled in any criminal case to be a witness against himself" and "[t]o protect this right, law-enforcement officers must give *Miranda* warnings before interrogating individuals that the officers have placed "'in custody,'" and therefore, "[t]he key question [] is whether the police-citizen interaction was a 'custodial encounter.'" United States v. Zongli Chang, Criminal Case No. 18-20008, 2018 WL 3640435, at *5 (E.D. Mich. July 31, 2018) (citations and internal marks omitted).

At the time TFO Cultarevic asked Hector for the password to unlock his cell phone, law enforcement had already discovered the narcotics in the cylinder and Trooper Munoz had just shown the defendants a photograph of the drugs found in the cylinder and made the "no bueno" comment to them.  (Tr. at 64-66, 88, 95-96, 110, 122-23, 126-27; Gov. 9 at 2; Gov. 9-A at 1:02:30-1:02:45).  The defendants

were arrested after the drugs were discovered in the cylinder, (Tr. at 14), and although the record does not reflect precisely when they were formally placed under arrest, defendants clearly were in custody by the time TFO Cultarevic asked Hector for his password, and the government does not dispute this point.[22] Likewise, it is undisputed that the defendants had not been advised of their Miranda rights when TFO Cultarevic asked Hector for the passcode to unlock his cell phone and recorded it as Hector typed it.  (Tr. at 78-79, 110-12, 122-27; Gov. Ex. 9 at 2).   Consequently, "police questioning asking for [Hector's] cell phone passcode, and [Hector's] act of providing the passcode," is due to be suppressed. Carter v. Davids, Case No. 1:19-cv-555, 2019 WL 6001698, at *13 (W.D. Mich. Nov. 14, 2019).[23]  Accordingly, it is **RECOMMENDED** that Hector's motion to suppress

---

[22] Indeed, the government implicitly acknowledges that the defendants were in custody when they were informed that they were officially being detained at approximately 54 minutes into the stop and subsequently placed in the back seat of the patrol car.  [Doc. 59 at 20 & n.10].

[23] Although Hector's testimonial act of providing the passcode to his cell phone is due to be suppressed, the Court must still address whether any evidence obtained from his cell phone is subject to suppression in connection with consideration of Hector's motion to suppress the search of his cell phone.  See [Doc. 31].

his provision of the password to his cell phone be **GRANTED**, but that defendants'

motions to suppress statements, [Docs. 30 & 33], otherwise be **DENIED**.[24]

## C.   Hector's Motion to Suppress Search of Cell Phone, [Doc. 31]

Hector moves to "suppress evidence seized from the warrantless search of

his cell phone[.]"  [Doc. 31 at 1].  In particular, Hector asserts that "his cell phone

was seized and accessed at the time of his arrest prior to the issuance of a search

--------

[24] In his motion to suppress, Hector only moved "the [C]ourt to enter an order suppressing any and all statements made by him after his arrest and prior to being advised of his *Miranda* [r]ights," [Doc. 30 at 1], and as the government points out, [Doc. 59 at 19 n.9], he does not make any arguments for suppression of his post-Miranda statements to law enforcement on January 26, 2019, at the Coweta County jail in his post-hearing brief, see generally [Doc. 52].  To the extent Hector argues that those statements should be suppressed as fruit of the allegedly illegal traffic stop, [id. at 1 (arguing that "the pre-textual stop, which was the legal equivalent to a seizure, was constitutionally infirm" and that "the warrantless search of the [] vehicle and all that ensued thereafter are fruit of the poisonous tree and should be suppressed")], his argument is without merit.  Under the doctrine of the "fruit of the poisonous tree," "evidence . . . discovered as a result of an earlier [constitutional] violation is excluded as tainted" in order to discourage future police misconduct.  Missouri v. Seibert, 542 U.S. 600, 612 n.4 (2004) (internal marks omitted).  "[T]ainted fruit can grow only on poisonous trees," however; "that is, . . . derivative evidence may be excluded as tainted only when the court has actually found a prior constitutional violation."  Bruno v. Cunningham, No. 03 Civ. 937(MBM), 2004 WL 2290503, at *12 (S.D.N.Y. Oct. 8, 2004) (citation omitted); see also id. (citing Oregon v. Elstad, 470 U.S. 298, 312 (1985)) ("Absent an underlying wrong, the fruit-of-the-poisonous-tree doctrine simply does not apply.").  Because the Court has not found that the traffic stop and subsequent search violated Hector's Fourth Amendment rights in this case, his motion to suppress statements as fruit of the illegal stop and search is due to be denied.

warrant," and he "therefore seeks to suppress information obtained from his cell phone." [Doc. 52 at 1 (footnote omitted)]. He contends that while "[a] search warrant for the phone was applied for and obtained," it was only after "the phone had been seized and the password illegally obtained from [him] prior to [the] issuance of Miranda." [Id. at 1 n.1]. He also contends that law enforcement then opened and unlocked his cell phone at the fire station "shortly after his arrest and prior to the issuance of a search warrant," which was prohibited by Riley v. California, 573 U.S. 373 (2014). [Id. at 6-7]. Thus, he maintains that even if "the derivative use of the password was constitutionally permissible, there can be no dispute any longer that the search of the phone required a warrant," [id. at 7], and he moves the court to "grant his motion to suppress data obtained from his cell phone," [id. at 9]. In response, the government asserts that "[w]hen law enforcement first obtained the password for Hector's phone at the Coweta County Fire Department, Hector was sitting in the back seat of a GSP vehicle without handcuffs" and "TFO Cultarevic asked Hector for his password, and in response, Hector typed it into his phone while TFO Cultarevic recorded it for future use," but "[n]o one performed a search of Hector's cell phone until the following day when consent was granted" during "Hector's interview with law enforcement at the Coweta County jail," at which time "law enforcement performed a cursory

search of Hector's phone and asked him questions about some of the information"

and then later "obtained a search warrant before performing a full extraction of

Hector's phone." [Doc. 59 at 24-25].

"A defendant who claims his rights under the Fourth Amendment to the

United States Constitution were violated has the initial burden to show that a

warrantless search or seizure occurred." United States v. Williams, No. 1:14-cr-

321-WSD, 2015 WL 4477785, at *4 (N.D. Ga. July 21, 2015) (citing United States v.

Bachner, 706 F.2d 1121, 1125–26 (11th Cir.1983)); see also United States v.

Alexander, No. CR 113-007, 2013 WL 6577297, at *6 (S.D. Ga. Dec. 13, 2013),

adopted at *4 (citations omitted) ("A defendant seeking the suppression of

evidence bears the initial burden of showing that he was subjected to an unlawful

search or seizure and that the evidence in question should be suppressed[.]").

While Hector asserts that law enforcement searched his phone at the fire station

by unlocking it, prior to the issuance of a search warrant and without his consent,

[Doc. 31 at 2; Doc. 52 at 6], the evidence presented at the hearing does not establish

that law enforcement actually searched the phone.  Instead, the evidence shows

that after the officers discovered the narcotics inside the cylinder, TFO Cultarevic

opened the door of the patrol car and asked Hector for the passcode to his cell

phone at which time Hector "typed it in on his phone" and TFO Cultarevic also

wrote it down for later use, but he never used the passcode or examined or searched the phone until after he obtained a search warrant.  (Tr. at 110-12, 122-28; Gov. Ex. 9 at 2).[25]

In addition, the evidence presented at the hearing shows that after Hector was transported to the Coweta County jail, he was interviewed by SA DeVogt and

---

[25] As previously discussed, TFO Cultarevic's request for the passcode to Hector's cell phone at the fire station violated Miranda, and Hector's response should therefore be suppressed, but if the statement was otherwise voluntarily made, then only the passcode, and not the evidence obtained through its use, is subject to suppression "because the fruit of that voluntary communication, even though made without a *Miranda* warning, would nonetheless be admissible into evidence."  United States v. Oloyede, 933 F.3d 302, 309 (4th Cir. 2019) (emphasis omitted).  Indeed, Hector's suppression argument appears to be foreclosed by United States v. Patane, 542 U.S. 630 (2004), in which the Supreme Court found that tangible evidence derived from voluntary statements obtained in violation of Miranda do not merit suppression, id. at 633.  Although Hector was seated in the back of the patrol car, he was unrestrained, and there is no evidence of any coercive or threatening actions on the part of TFO Cultarevic, who did not raise his voice, make any threats, or utilize his weapon, when he asked Hector for the passcode to his cell phone.  (Tr. at 110-11, 122-28); see also United States v. Orozco Ramirez, CRIMINAL ACTION FILE NO. 1:17-cr-185-LMM-AJB-01, 2019 WL 2165920, at *9 (N.D. Ga. Apr. 22, 2019), adopted by 2018 WL 8337421, at *1 (N.D. Ga. May 17, 2018).  "Therefore, because [Hector's] statement[] w[as] voluntary and not the result of police trickery or deception, *Patane* mandates that the subsequent search by [consent and] warrant of [Hector's] cell phone, access into which [may have been] accomplished by the passcode that [Hector] provided, was lawful and the [g]overnment may seek to introduce at trial evidence seized as a result of th[ose] search[es]."  Orozco Ramirez, 2019 WL 2165920, at *9 (footnote omitted).

TFO Marrero after being advised of his Miranda rights.  (Tr. at 14-16, 130-32; Gov. Exs. 7 & 8; Gov. Ex. 11 at 2-4).  During the video-recorded interview, SA DeVogt and TFO Marrero asked Hector for consent to search his phone, and Hector agreed and initialed and signed a Spanish consent to search form indicating that he agreed to allow the officers to search his phone and that he had not been forced to do so and that he consented of his own free will.  (Tr. at 17-18, 132-35; Gov. Exs. 7 & 8; Gov. Ex. 11 at 50-56).[26]

Absent evidence that law enforcement conducted a search of Hector's phone prior to his consent, Hector has failed to satisfy his initial burden of showing that a search was conducted in violation of the Fourth Amendment.  See Williams, 2015 WL 4477785, at *4; see also United States v. Boudreau, CR No. 16–011–M, 2017 WL 3208469, at *2 (D.R.I. July 27, 2017) (finding that defendant's motion to suppress warrantless search of cell phone suffered "a fatal factual flaw" in that "no warrantless search of [defendant's] cell phone occurred, or at least nothing in the record [gave] the Court cause to believe that one occurred").  Moreover, Hector

---

[26] The video recording of the interview shows SA DeVogt picking up Hector's phone and taking it apart and handling it in some manner, but it is unclear whether the passcode that was previously obtained at the fire station was used to access Hector's phone at this time.  See (Gov. Ex. 1 ¶ 32; Gov. Exs. 8 & 11).

has not identified any evidence to be suppressed from TFO Cultarevic's alleged warrantless search of the phone by unlocking it at the fire station, see Hardy v. United States, Nos. 1:08–CV–90027 WLS, 1:05–CR–22 WLS, 2008 WL 8126040, at *3 (M.D. Ga. Oct. 14, 2008), adopted by 2010 WL 4260212, at *1 (M.D. Ga. Oct. 21, 2010) (citation omitted) (Even "[a]ssuming *arguendo* that there was an illegal search . . ., nothing was seized which could have constituted 'fruit of the poisonous tree' to be suppressed[.]"), nor has he challenged the validity of his consent or the search warrant subsequently obtained for the phone,[27] or the search of the phone

---

[27] Even if he had challenged his consent to search the phone, it would be without merit since his consent was knowing and uncoerced. "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Garcia, 890 F.2d at 360. As previously explained, "[t]he principles for determining the voluntariness of consent for a search are the same as those for determining the voluntariness of a confession– i.e. whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances." Boskic, 2006 WL 1540488, at *19 (citation and internal marks omitted); see also Tovar-Rico, 61 F.3d at 1535 (noting voluntariness of consent is judged in light of the totality of the circumstances). Relevant factors include the presence of coercive police procedures, the extent of the person's cooperation with the officer, the person's awareness of his right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. Purcell, 236 F.3d at 1281; see also Chaidez-Reyes, 2014 WL 547178, at *15. Ultimately, the burden is on the government to prove that the consent was given voluntarily. Bentley, 151 F. App'x at 827 (quoting Chemaly, 741 F.2d at 1352). As previously discussed, during the interview, Hector was presented with a Spanish consent to search form, which TFO Marrero explained to him and allowed

performed by SA DeVogt pursuant to Hector's consent or the search performed

pursuant to the warrant, see United States v. Broxmeyer, 08-CR-21, 2008 WL

11422677, at *1 n.1 (N.D.N.Y. Aug. 28, 2008).  Accordingly, it is **RECOMMENDED**

that Hector's motion to suppress evidence obtained from his cell phone, [Doc. 31],

be **DENIED**.[28]

---

him to read, and then Hector voluntarily consented in writing to the search of his
cell phone, by completing and signing the form in the presence of SA DeVogt and
TFO Marrero.  (Gov. Exs. 7, 8, & 11).  Hector did not later revoke the consent to
search his phone, (Tr. at 18; Gov. Exs. 8 & 11), and neither SA DeVogt nor TFO
Marrero threatened him, made him promises, or engaged in physical contact with
him to coerce his consent, (Gov. Exs. 8 & 11); see also Zapata, 180 F.3d at 1242
(alterations in original) (citation omitted) ("'[T]he absence of intimidation, threats,
abuse (physical or psychological), or other coercion is a circumstance weighing in
favor of upholding what appears to be a voluntary consent.'").  "Considering the
totality of these facts and circumstances, and comparing this encounter to more
coercive circumstances that have nonetheless been found to be consensual, the
Court finds that [Hector] freely and voluntarily consented to a search of the [cell
phone]."  Rodriguez-Alejandro, 664 F. Supp. 2d at 1338 (citations omitted); see also
Brown, 223 F. App'x at 880; Hidalgo, 7 F.3d at 1567, 1571; Garcia, 890 F.2d at 361.

[28] In his post-hearing brief, Jose argues that "the seizure and search of . . .
his phone [is] fruit[] of the unlawful questioning and Fourth Amendment
violations."  [Doc. 56 at 1].  He also argues that "despite bearing the burden to do
so, the government also never established when during the encounter it seized
[his] phone and from where, whether his person or the car" and that "[t]he seizure
of the telephone must also be suppressed."  [Id. at 13].  The government asserts
that "Jose filed no motions directed at his cell phone," "at no point in time did
Jose's counsel indicate he was attempting to suppress anything related to Jose's
cell phone," and "none of Jose's motions reference potential suppression of a cell

**D.** **Motion to Sever, [Doc. 34]**

At the pretrial conference, the prosecutor informed the Court and counsel of a potential issue under <u>Bruton v. United States</u>, 391 U.S. 123 (1968), if the defendants proceeded to trial based on the statements Hector made to law enforcement implicating Jose in the offenses charged in the indictment, and Jose subsequently filed a "Motion for Severance of Defendants and Exclusion of Out-of-Court Statements of Co-defendants," [Doc. 34 (all caps omitted)], in which he seeks a "severance of defendants and exclusion of the out-of-court statements of

---

phone." [Doc. 59 at 25 n.11 (citation omitted)]. However, Jose did reference the seizure of cell phones from the vehicle in his motion to suppress evidence, [Doc. 32 at 1-2], even if he did not make the precise arguments presented in his post-hearing brief. Putting aside whether the arguments are properly before the Court, they lack support in the record. <u>United States v. Bourassa</u>, CRIMINAL ACTION FILE NO. 4:18-CR-0003-MLB-WEJ-1, 2019 WL 7559294, at *8 n.12 (N.D. Ga. May 20, 2019), adopted in part by 2019 WL 5288137, at *8 (N.D. Ga. Oct. 18, 2019) (citation and internal marks omitted). The affidavit in support of the application for the search warrant for Hector and Jose's cell phones admitted at the evidentiary hearing clearly outlines that both of their cell phones were seized from their rental vehicle after the drugs were discovered in the cylinder. (Gov. Ex. 1 ¶¶ 3, 29). Furthermore, because the Court has found that the traffic stop and subsequent search of the vehicle did not violate Jose's Fourth Amendment rights, nor did the questioning violate his Fifth Amendment rights, his argument that evidence seized from his phone should be suppressed as fruit of the illegal stop, search, and questioning is without merit.

Hector [] implicating him in the charged offense conduct," [id. at 1]. The government has informed the Court that it does not oppose Jose's motion, and because a Bruton issue is presented based on the statements Hector made to law enforcement implicating Jose in the offenses charged in the indictment, it is **RECOMMENDED** that Jose's motion to sever defendants and exclude from his trial the out of court statements Hector made to law enforcement, [Doc. 34], be **GRANTED**.

## III. CONCLUSION

For the reasons stated, the joint motion for an extension of time to supplement the record, [Doc. 65], is **GRANTED**, and it is **RECOMMENDED** that the motion for severance, [Doc. 34], be **GRANTED**, that Hector's motion to suppress statements, [Doc. 30], be **GRANTED IN PART** and **DENIED IN PART**, and that the remaining motions to suppress evidence and statements, [Docs. 29, 31, 32, & 33], be **DENIED**.

There are no other motions pending before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of the trial.

Accordingly, **IT IS ORDERED** and **ADJUDGED** that this action be, and the same is hereby, declared **CERTIFIED READY FOR TRIAL**.

**IT IS SO ORDERED** and **RECOMMENDED**, this 22nd day of July, 2020.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE